May it please the court, my name is Beverly Singleman and I am the attorney for Minidoka Irrigation District in this case. This particular matter comes before the court once again on the very same legal issue. And that is, are Minidoka's claims for breach of contract and its statutory law barred by the six-year federal statute limitations for lawsuits against the United States government? This very same issue, but in a different context, was before this court six and a half years ago. It came up at that point on summary judgment. Isn't that the critical issue, though, that without concluding how the case gets decided necessarily, that when it came up before it was on summary judgment, so one would look at these letters and look at the record and all inferences had to be given to the non-moving party, to your client. But then it goes back and the judge gives it a trial and then makes some findings. Isn't the standard of review then just whether he's clearly erroneous? In other words, why is there any conflict with that earlier decision? Even though the context was different, it did come up, like you said, from summary judgment in that case. But to decide the issue on summary judgment, the documents, the evidence, the facts in that case seven years ago, the three letters, the 1963 order from the Secretary, those particular facts are all historical facts. They're all the same. They're the same. They haven't changed in six and a half years. Except that on the first hearing in the Ninth Circuit, we had to give all inferences to the non-moving party. So if there was any ambiguity at all, we had to construe the documents and the circumstances the other way. But now there's been a trial. So it would seem that the standard of review kind of points in the other direction, that we can't overturn the district court unless the determinations are clearly erroneous. And I disagree with that only to the extent, in the sense that the court, this court on appeal, reviews de novo a district court's determination on a statute of limitations defense. Okay. Did, in other words, yes, perhaps the standard is different in terms of the deference you give in a summary judgment as opposed to a trial. But the legal standard in terms of what constitutes an anticipatory repudiation is based on unambiguous, unequivocal conduct. And by reaching that standard, you cannot do what the district court did in this case after trial by taking these very same documents that this Court looked at prior and said the language in these documents is equivocal. Here it says one thing and down here it says something else. But it also said it looked like there might be repudiation. It said it looked like there may be repudiation. That's true. But whether that constitutes anticipatory repudiation, which will then trigger statute of limitations, is an entirely different issue. It's an issue that has been completely ignored in this case, no matter how many times we've argued it and raised it, and it's an issue that this district court ignored again after trial. Keep in mind, after trial, we had seven days of testimony, we had thousands and thousands of pages of historical documents that it could then look at more clearly the context of those original three letters and look in terms of where they fit in and was there equivocal language. The court didn't do that. It went back to the very same documents that it had looked at before. It even said in the background part of his decision, he acknowledged that there was equivocal language in those documents he was looking at, but by putting on blinders and only narrowing in on one sentence out of this entire letter, he's saying that that letter gave unequivocal notice to the Irrigation District that the government intended to completely repudiate its contractual obligations to the Minnegoga Irrigation District, and therefore, they should have filed suit right then or now. It's way too late. The six years has run. I would also say that, again, this is not the law. The doctrine of anticipatory repudiation is not a sword to be used by the breaching party. It is a shield. It is meant as a part of public policy to protect the government or a contracting party who may at some point before performance is due say, I can't perform, I don't want to perform, I've changed my mind, it's a bad deal. When that happens, and you will find this in the law, it's been in the law in the Ninth Circuit since 1938, it's certainly been the law, the Supreme Court law, for almost 100 years, and that is that when anticipatory repudiation occurs, if it does as a finding of fact, legally, it does not start the statute of limitations unless the non-breaching party decides at that point, I've had it, I'm going to court, you know, I'm not going to wait until down the road when the party breaches. It is meant to be a shield to the breaching party so that it has the chance to fix the breach before performance is due. When you call this an anticipatory repudiation, all of these years it had obligations that it would have had to have performed under the contract. Is that not correct? If your view of what the contract is saying. Yes, this contract and the court below and this court in its first opinion agreed that the government's obligations to Minidoka and the irrigation district is a continuing obligation. It's something that is triggered every year when it is required to account to the project and the irrigation districts what net revenues there are from power and other revenue streams. It's not just from power. And if it doesn't do this in a particular year, it has then breached the contract as to that obligation that year, but it's a continuing claim. Would you clarify one thing? Yes. Much of the contract obligation, of course, stems from various statutory, from the statutory framework that's here. Yes. And the district court said the only remaining claim and the only one he dealt with was a contract claim. In the briefing on appeal, there seems to be some merger of a sort of quasi-statutory claim and a contract claim, and it goes back and forth in both the government's brief and yours. So in your view, do you have an independent statutory claim that remains? Yes, we do. Okay. And And that was part of the takings claim in terms of the remedy. And that is if the government has, through its actions or through subsequent legislation, has put itself in the position that it can no longer perform under its obligations under the Federal law, which is not only the fact-finders fact of 1924, but is also a very specific piece of legislation enacted only for the Minidoka Irrigation Project in 1926. And this was acknowledged by the government's historian, that he had never seen any statute like this that favored any other district, which said, again, annually, these surplus revenues will be applied as a credit towards this project. Let me try to clarify that. So the district court said because they only had one cause of action left, the breach of contract, that the court was not going to address your takings claim. Correct. Because it was considered to be a remedy. Right. Because that was considered to be a remedy. And in your view, have you preserved a statutory or a takings claim on appeal in your appeal to this Court? I don't think that issue is even relevant to what we're here for. The court clearly said that. Well, you might not think it's relevant, but we're trying to sort out the record. Well, what I'm saying is that the way the court erred as a matter of law was, even if for the sake of argument, we agreed with the court's findings, and then the court's legal conclusion that those extrapolated sentences in those various exhibits constituted unequivocal repudiation of the contract, which, of course, we do disagree with, but if we accepted that for the sake of the argument, that's not the end of the case. It didn't mean that in 1966 and 1968 and 1985, the statute of limitations then began to run and we were too late when we filed this lawsuit in 1991. Well, see, now, I think that it matters on how you analyze it. And let me just give you my take and then you can help me on it. If there is unequivocal repudiation of the contract, I don't think it matters that the contract might have downstream obligations. It just, if there's unequivocal repudiation and it's over, it seems to me that there's not a continuing violation theory under the contract. However, if your claim is not just under the contract, but you have an ongoing statutory claim, the answer might be different. I don't know for sure if it is, but it seems to me the answer might be different. And that's why I'm trying to understand if you only have the contract claim, then we analyze it under those cases. But if you have, and I'll ask the government its view, if you have a remaining statutory claim, then we analyze it in terms of an annual statutory obligation. I mean, do you think there's a difference between the two? I don't think there's a difference whether you're speaking of the statute's requirements or the contract. Keep in mind this contract in 1927 was a contract entered into whereby the district agreed with the government how its monies, its net credits, it had been accumulating for, at that point, nearly 20 years in a suspense fund, how it was going to be spent. And in that contract, the government also agreed that it would provide an annual accounting in terms of it got to determine whether there were going to be net revenues or not. And I want to again go back to the Franconia case. Well, you know, we're familiar. So if we have a contract, if you and I have a contract, and I say, you know what, I don't care what my obligations are yesterday, today, or each of the hundred years from now to whenever, the next millennium. I'm just not doing it. It's over. Done. The contract is finished. Your view would be that that kind of repudiation wouldn't stop the statute of limitations on downstream breaches. Because I, as a non-breaching party, get to decide whether I want to treat that as an anticipatory repudiation and go immediately to court prior to your duty to perform. Or whether I want to wait and say, well, maybe they'll change their mind, or maybe this isn't a good time at this point to file a lawsuit or go after this. Maybe, you know, a year from now you'll change your mind when that burden is due, and you'll do. My assumption seems to be that there could never be a total anticipatory breach, like an unequivocal repudiation of an ongoing contract, that you would always have to reassess whether at a later time a party wanted to perform. I respectfully disagree. My opinion, again, is based on the law of anticipatory repudiation, and that is, is it a sword to be used by the breaching party to trigger statute of limitations, or is it not? And the law is clear, including, like I said, the Franconia case that, the United States Supreme Court Franconia case. This case is similar in the facts, in the sense you had a congressional program, which was for people to borrow money, loans, to build housing. And in that, at the time that this program was enacted by Congress, they wanted to turn those loans. They wanted to encourage people to pay them, pay back as quickly as possible, get that money back into the fund to then give the money out for new projects. Part of the congressional enactment allowed prepayment of those loans. As history proved, at a certain point in time, people didn't want those loans anymore. They weren't applying for them, and the government decided that this was a bad deal. They didn't want these loans to be prepaid. So Congress enacted a statute which said, effective of the date of that statute, which I believe was 1979, these people could no longer prepay their loans, even though at the time they got them, they could. The issue in Franconia was, when that legislation was enacted, which made it impossible for the government to do anything other than reject the contracting party's request to prepay, did that trigger the statute of limitations? Clear repudiation here. Congress changed the law and said, you can't allow prepayment anymore. You can't accept it. The lower courts said, yes, that triggered the statute of limitations. That is, it was clear repudiation when Congress changed the law. When that case came up to the United States Supreme Court, the United States Supreme Court disagreed. They said that the change of the federal, by Congress, may have been a breach, but it was still up to the parties, the non-breaching parties, to determine whether at that point in time they wanted to file their lawsuit, they probably could have, or whether they were going to wait until performance. They went to the government and said, I want to prepay. And the government said, no way. We can't do it anymore. The Supreme Court in Franconia said that that's what triggered the statute of limitations, is when those contracting parties requested the prepayment under their contract and the government said, no, we're not going to do it. It wasn't 10 years before that when Congress enacted the legislation telling the government that you're not allowed to accept prepayment anymore. And I'd like to just read again. Here you have more than the statutory changes. You've got the letter. Let's take the 1966 letter, which says that the transfer of power marketing authority to BPA precludes the possibility of having any net power revenues from the operation of Bendidoka Dam as an isolated plant. So, I mean, why isn't that a clear statement from the government that under the current statutory scheme, there just isn't going to be any payment of revenues? That statement wasn't that there wasn't going to be any revenues. It said what had happened in the 1960s when they had offered to buy out the districts, their power privilege right by contract, through an amendatory contract, which they had to get. They couldn't just change the rules. They had to amend the contract to buy out these projects so the government could then take these facilities, throw them into an integrated system and not have to account individually. It had become an accounting nightmare for the government. And this is in the congressional reports. The reason why they asked that this amendatory contract be blessed was to get rid of this complicated accounting system. It wasn't that you couldn't do it. It was just that the accounting had become a nightmare. Well, the letter seems to say that the transfer of power to BPA, quote, precludes the possibility of having any net power revenues, close quotes. So if there aren't going to be any net power revenues from Minidoka Dam, how could proceeds be tendered to your client? Again, this is an accounting issue in terms of could they account for the power. The legislation when, excuse me, it wasn't legislation. It was the secretarial order that transferred the marketing, not ownership, but the marketing of the power over to BPA specifically said, and that's in the letter and it's in this Court's opinion as well, specifically said that it was supposed to take over this duty and abide by all existing contracts. This is an existing contract. It may have been hard for them to do this, but it wasn't a matter that they couldn't do it. And this came out subsequently in 1966 in some legislation with the Grand Coulee Dam. It's in my brief. It had to do with a writer. It had to do with senators at that point in time questioning what the government was doing, that the Congress had never authorized this pooling of revenues. What happened was is that the government was taking all of the revenues in a bulk and was using those revenues to pay off projects that hadn't paid out, regardless of whether that project generated a penny of money from power revenues. They may not even have had a power plant on that project. So this was what was going on clear up into the 1960s in terms of not whether they could do it, but whether they wanted to do it or not, and they didn't. And I think what's – Do you want to reserve your remaining time for rebuttal? Yes. I'll just make one more comment. And I think what's telling in this case is when the commissioner of reclamation, when his deposition was taken, said that when he became the regional director, because he was the regional director over Minidoka Project, said that when he came in, he was not even aware that Minidoka Irrigation District had not signed an amendatory contract. And this is what had happened. Everyone had forgotten a very major fact. Minidoka never signed an amendatory contract. Thank you. May it please the Court. My name is Bob Grisham. I'm here representing the Bureau of Reclamation. Initially, I'd like to point out that it's our view that there is no separate statutory cause of action that this Court needs to address on appeal. I think if you read the Court's opinion after the trial, it's very clear that the Court believed that the only issue that it was addressing was a breach of contract issue. That was the only issue going into trial. During the trial, the plaintiff, Minidoka Irrigation District, never objected to that, never tried to convince the Court there was a separate statutory claim out there, but proceeded to appeal from the final judgment, in this case, dismissing on the basis of the statute of limitations. And it's very clear that that's the only order appealed from, is the order finding that the statute of limitations barred their contract action. So it's our view that this is simply, on appeal, an issue regarding whether or not the contract, the 1927 contract, is barred by the statute of limitations. Was there a formal pretrial order in the district court? There were joint pretrial briefs, Your Honor, filed. And in the brief filed by MID, they did allude to the separate statutory right that they have in addition to the contract. But it was not litigated as far as the district court was concerned. We never really briefed the issue. Was there a pretrial order that defined the issues for trial? To my recollection, there really wasn't, Your Honor. I think if you read the Court's order dismissing the case, it's clear that the Court believed that the only issue it was addressing was a breach of contract issue. I know where the Court ended up. Pardon me? I know where the Court ended up. I was trying to determine if there was an issue limiting pretrial order, which would control the case. No, there was a long and sort of tortuous path that we had to take until trial. As you know, the Court knows this case was around since 1991. It was up here before on the statute of limitations issue. In that case, the Court recognized that there were other issues involved in this case. There was a takings claim, there was a breach of fiduciary duty claim, and there was an ultra vires claim. In 1998, this Court agreed with the district court's dismissal of the ultra vires claim. But when it went back from this Court, it was very clear there were three claims left. There was a breach of contract claim, there was a takings claim, and there was a breach of fiduciary duty claim. And at that point, both sides seemed to agree that those were the only claims that were still at issue. There was additional, and we pointed this out in our brief, Your Honor, in the history of the case. We filed another motion for summary judgment on all three of those claims, the breach of contract claim, the takings claim, and the fiduciary duty claim. And the Court went ahead and dismissed the breach of fiduciary duty claim and dismissed the takings claim, leaving what we thought was the only remaining claim was the breach of contract claim. And so as it evolved, there never was any briefing, there never was discussion at all about a separate statutory claim. And so as it evolved, when we finally went to trial, everybody except probably MID believed that we were dealing with a breach of contract claim. If we have a breach of contract claim, there is some traction in the Supreme Court's Franconia case about what do you do about repudiation. And here a combination of the government's position plus statutory changes brought about why there wasn't going to be any money, I guess, is the bottom line here. There weren't going to be any revenues to hand out. But Franconia says, you know, that could be only temporary. They could change their mind. Legislation could change. And therefore, the Supreme Court clearly says it's the – it's not the repudiator who gets to, in effect, pick the termination of the contract. It's the party to whom benefits or obligations are owed. How do you distinguish your case from Franconia? That's a good question. And I think that's the distinction that the plaintiffs in this case have been missing. This is not a case of anticipatory repudiation, which is what Franconia involved. What Franconia involved was a repudiation before the time for performance under the contract was due. The time for performance had not yet arrived, and the government is saying we're not going to allow you to prepay these loans. Further, the government argued that the statute which precluded prepayment made performance under the contract impossible. And the Supreme Court disagreed and said, you know, you can pass a statute and you can change a statute. So it's always possible before the time for performance that Congress could change the statute or modify the statute to allow prepayment. But the critical issue, Your Honor, was the fact that the repudiation took place before the time for performance. In the 1998 Minidoka case before this Court, in finding that repudiation started the running of the statute of limitations, the Court cited the Trustees for Alaska case, which is a prior Ninth Circuit case. And that case, in turn, cited Corbin on contracts. And Corbin on contracts is very clear that in a claim or contract providing for continuing performance or installments, if you have a partial breach by non-performance coupled with repudiation, that constitutes a total breach of the contract and provides for one cause of action. And that's when the statute of limitations starts to run. And so what we have in this case is not only a repudiation, but that repudiation is coupled with non-performance. The last profits paid to the district under the contract were probably in 1962. In 1963, we had the secretarial order transferring power marketing responsibilities to the Bonneville Power Administration. You have the letter in 1966, which the Court referred to. Another letter in 1968. Another letter in 1985. The last time they'd gotten profits was in 1962. And so in addition, and regardless of when you want to deem the repudiation as occurring, at the time the repudiation occurred, there had been non-performance. And, Your Honor, that's the distinguishing characteristic between this case and Franconia. Because it's not an anticipatory repudiation. It was an actual breach by non-performance. Breach by non-performance coupled with repudiation. Coupled with repudiation as to the future. Right. And then Corbin says that's distinctly different than an anticipatory repudiation, when you actually say before the time for performance that you're not going to perform the contract. Robert, Franconia, of course, came out after the Ninth Circuit decision, but before Judge Windmill. Correct? It came out before Judge Windmill. In the middle. Yes. Yeah. All right. But it is distinguishable. Let me ask you a question about this possible statutory claim. And I understand you're saying the government's position is the statutory claim wasn't properly, isn't properly before us now. That's correct, Your Honor. But assuming it were before us, assuming you view that differently, is the limitations analysis, would it be different for the statutory claim or the contract claim? I believe the analysis would be the same, Your Honor. I assume, and backing up, if it's a statutory claim, it would have to be brought under the Administrative Procedure Act. It'd have to be an APA claim in district court. And the statute of limitations for an APA claim, I believe, is six years, which would be the same as it would be for a contract action. And the performance under the statute would have stopped at exactly the same time as performance under the contract. That is, in 1962, when power marketing responsibilities were transferred to BPA. And if, in fact, that statute required the payment of power profits or the crediting of power profits in the same manner as the contract did, the statement that there will be no more profits, we aren't going to comply with the contract because of this transfer would apply equally to the contract claim, the statutory claim, as well as the contract claim, I believe. So your position would be even if there is a statutory claim that we can address, the limitations analysis is congruent with the contract claims? Yes, Your Honor. So that if we went for your client on that, it would be dispositive on the statutory claims also? That would be our position, yes. Would that apply to the original fiduciary breach claim? We had argued, Your Honor, initially that the takings claim, the fiduciary duty claim, and the breach of contract claim were all barred by the six-year statute of limitations essentially for the same reason. When this Court found that there was a question of fact as to whether or not repudiation had occurred on the contract, it also sent back the fiduciary duty and the takings claims. And so the theory was the same, that there was a repudiation in the sense that it was a breach of the fiduciary duty or a repudiation of any fiduciary duty that existed. And the argument was that because of this fiduciary duty, the government had an obligation to make profits for them under this contract. And we argued on the fiduciary duty claim that profits stopped. And when power market responsibilities were transferred to BPA, that was a repudiation of that fiduciary duty, if one existed, which we denied, because at that point it became impossible to make profits because BPA markets power costs essentially. So, yes, our arguments were pretty much the same on the takings claim, the fiduciary duty claim, and the contract claim. However, the fiduciary duty and takings claims were actually dismissed on the merits by the Court for other reasons, not on the statute of limitations grounds. But if they weren't the same analysis for the statute of limitations claim, when they appealed this time, they could have brought that up, and they didn't, I guess. I'm sorry. I didn't understand your question. Well, when you get what appears to be a final order from the Court on all issues, then you can bring up any prior judgments or orders. So those dismissals could have been included in this appeal if and if they had a different rationale, but it was not done, and it wasn't argued here, I believe. That's correct, Your Honor. There was no appeal of the dismissal of the fiduciary duty or the takings claim. And in talking about the takings claim, there was an actual takings claim where it was argued that we took certain rights they had to profits, and that claim was dismissed. What the Court held in the pretrial order on the takings was that he would – and, again, this shows the Court's view. He said, you know, this is a breach of contract action,  but if you establish a breach of contract claim, I will consider a takings remedy. And so there was no takings claim going into trial. Turning my attention, then, to the repudiation, the plaintiffs have tried to argue that that is now a legal question as to whether or not the Court correctly determined there was repudiation. And I think, as Judge Gould mentioned before, when it was up before the Court the first time in 1998, the Court was reviewing a summary judgment, and it resolved all inferences in favor of the Mendel Irrigation District and pointed to all interpretations of the letters and the statutes and the order that could be construed as not amounting to a repudiation. But the Court didn't take that evidence, and it didn't find as a matter of law that those documents or those acts did not constitute repudiation. What it did find was that there was a question of fact, pointing out different ways that each of those things could be interpreted. And so when the Court went back and viewed these things again, it chose, based on the evidence it heard at trial, to adopt the interpretation that was consistent with repudiation. And one of the arguments that MID has sort of attempted to make is this argument that, well, you also told us that at this time that expenses were going up, and because of the expenses that there aren't going to be more profits, and because of that, that that alone wouldn't be an indication that you're going to breach the contract, that you're just not going to pay profits because there aren't any. But going along with this was the whole VPA issue, and there were essentially, in the letters where both of those things were mentioned, what the Bureau was telling MID is there really are two reasons that you aren't getting any more profits. One is that the costs are going up anyway, and so even if we hadn't transferred power, market, and responsibilities to BPA, there wouldn't be any profits. But in addition to that, we did transfer power, market, and responsibilities to BPA, and because of that, there simply cannot be any profits in the future. And there were essentially three things that really addressed the whole BPA issue. One was the 1963 secretarial order, which transferred power, market, and responsibilities to BPA, and in reviewing that order in the 1998 decision, the court did say that that could be construed as advising MID that there would be no more profits because of the transfer. And so this court essentially found plausible a construction given to that order by the district court judge. You see, I thought that was convincing until I read Franconia, which intervened, and it basically said when you have these things that come up by operation of law, such as legislation, that in effect they're transitory because, for example, if they transferred it away from BPA and it was under some other regime five years from now, maybe there would be profits. I mean, who knows? So I'm thinking that relying on that aspect would be at odds with Franconia, it seems to me, to rely on the legislation or the legal transfer, would it not? I don't think it would, Your Honor, and I think the distinction is, number one, is that in Franconia they were arguing that before time for performance came due, that the government made performance impossible. In this case, the government was already not performing with the contract. They weren't getting profits. And when they transferred this power of marketing responsibility to BPA, the secretarial order is – and that's the only – what the district court held with respect to the secretarial order is that that put MID on notice that there wouldn't be any additional profits, not that that act in and of itself made performance of the contract impossible. And so what the court did is, as I was going to point out, you look at this 1963 order, and this court in 1998 said that could have put the district on notice that there would be no more profits, not that it made performance impossible like the government was arguing in Franconia. Then the court looked at the 1966 letter to MID, which said, as we've told the board before, which would indicate this issue had also come before MID's board before, because of this transfer of power of marketing responsibilities to BPA, there can't be any more profits. So this is 1966. You've now had four years with no performance. You've had the secretarial order, which seemed to make performance impossible. And now in 1966, you have the bureau telling MID, look, because we transferred power of marketing responsibilities to BPA, there can't be any profits in the future. And so now you've got a period of four years with no performance. You've got the order, and you've got a statement, a clear statement saying we can't perform under the contract. Let me ask you to clarify something that may also be pertinent to Judge McEwen's question. The appellant argued that we should review de novo whether there's a limitations of the action here. But my thought previously was that we've got the district court making a determination that the BOR had unconditionally, unequivocally, and positively repudiated any obligation under the 1927 contract, and that I thought that in the Ninth Circuit the Minidoka I opinion held, and this I would have thought would be the law of the case, that the question whether a party has repudiated is one of fact. So if Minidoka said that the question of repudiation is a fact issue, and that was at 154 F. 3rd at 927, would we review that, the current determination for clear error? It's our position that you would. I mean, if Minidoka I or the 1998 Minidoka case, the court said that repudiation in the Ninth Circuit is a question of fact. I'm just quoting a quote. In the Ninth Circuit, the question whether a party has repudiated is one of fact. 154 F. 3rd at 927. So if I put that together with what the district court says after the remand, based on the combination of the statutory scheme, but more importantly, what the government has said in their letters, then it seems to me we're reviewing this repudiation for clear error. That's correct. I mean, that's our position, is that the judge is finding, if I understand your question, Your Honor, it's our position that the judge is finding that there was repudiation is reviewed on a clear error standard because he is resolving a question of fact. And that's essentially what the Ninth Circuit told him to do in 1998. And his application of that to the law is de novo, but as long as his factual finding fits within the six years, then there's no issue, right? That's right. I mean, it's our view that the repudiation issue is a factual issue. For example, the MID side has some cases that said that on contract interpretation, the judge's finding of what extrinsic evidence there is is a finding of fact, but how those facts relate to contract interpretation is a question of law. In this case, it's our position, and I think that's what the Ninth Circuit said, is that repudiation, whether there has been a repudiation, is a question of fact that's reviewed on a clear error standard. But whether that repudiation starts the running of the statute of limitations, whether that's the kind of question. That's a legal question. And it's our position that that question was also answered by the Ninth Circuit in 1998, and that's the law of the case because the Ninth Circuit did find that repudiation in that case, given those facts, would start the statute of limitations running. But it seems like the earlier Ninth Circuit opinion might be read to be saying that the only question here is whether there was a repudiation. If there was, it started the statute running, and it's too late. At least that's how I read it. That's how I read it as well. And then the question of whether the earlier Ninth Circuit decision also said whether there's been a repudiation is a fact question. So it doesn't really leave us as broad a sway with the case as we would have if we were looking at it totally fresh. No, and I guess I was assuming, Your Honor, I know I'm out of time to respond to your question. I was assuming that one of the things MID was asking for was for the Ninth Circuit to change the law of the case in this case. And I was prepared to address that, but I'm out of time, so I won't. Thank you. Okay. Thank you. Ms. Engelman, you think you're almost beyond your time, but we'll give you a minute for rebuttal. Thank you, Your Honor. Again, I would like to address the distinction, which is the government has always made in this case between repudiation, where you have a continuing obligation from year to year as in our contracts, as opposed to a performance out in the future that isn't required to be met at this point in time and when the repudiation occurs, is the United States position is that those two types of factual situations are different in terms of when such limitations is triggered. And I would tell you that if you looked at the San Carlos case that's referred to in my reply brief, I believe, that was a case where there was a government, again, reclamation contract that required it to maintain radial gates. There were three separate incidents several years apart where flooding occurred because those gates had not been maintained properly. The irrigation district in that case did not sue the first time the government didn't meet its obligation. It sued the third time. And the government took the position that, well, no, when we breached, we breached. You know, we messed up at that time and the statute of limitations is running. You're out of luck. Well, in the San Carlos case, the Federal Claims Court ruled differently. It said that the government could not take its breach and say that this was a one-time obligation, that this was a continuing obligation. Was that a repudiation case? That was a repudiation case, yes. Okay. We'll take a look at that. I have – I know your time's up, but if you could just address this one point, I would appreciate it. Yes, sir. What is the appellant's best argument, in your view, in response to what the Minidoka No. 1 court said, that the, quote, the question whether a party has repudiated is one of fact? In other words, doesn't that require us to review the district court's conclusion that they had, that BOR had unconditionally, unequivocally repudiated for clear error? And if not, why not? When the court finds that there had been an anticipatory repudiation, it is not making a finding of fact. It's making a conclusion of law. Well, but Minidoka No. 1 said this. I'm reading the sentence from Minidoka 1. Right. Are you asking us to alter that? I'm saying that in Minidoka 1, when the court made the determination for summary judgment, again, anticipatory repudiation is twofold. Was there a repudiation? That's a factual determination. And then secondly, did it rise to the level where it's going to trigger a statute of limitations? And again, the courts are clear. In the summary judgment case, this court never had to get to the second step because it found that there was enough conflict in the evidence that there wasn't an unequivocal repudiation. Therefore, you go back and try it. And you make that determination first. The court never got to the second step in terms of when the statute of limitations would work. So would you then concede that on the first step, we review that for clear error? Whether the repudiation occurred under the standard of what a repudiation is, which is that it has to be unequivocal. Right. Not equivocal. But you disagree. But do you think it was clear error? We're not afraid of the clearly erroneous standard, Your Honor. This, even as a factual matter, that this finding was clearly erroneous, under the legal standard of what is a repudiation. And that is that it be clear, unambiguous, and unequivocal. And every one of those letters is as equivocal as you can get. I want to just, on a personal note, commend you and your colleague in opposition. It's rare we see a case where advocates can so forcefully cover legal terrain going back to the 1920s. It's not an easy feat. And I think both sides have done it here with great skill. Thank you. Thank both counsel for your arguments. And the Minidoka Irrigation District versus the Department of Interior is
judges: B. Fletcher, McKeown, Gould